# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KERRY HARMON,<br><br>      Plaintiff,<br><br>      v.<br><br>CITY OF POCATELLO; POCATELLO POLICE DEPARTMENT; and SHANON BLOXHAM, BRANDON VAIL, SHAUN WRIGHT, and RUSS GUNTER in his and/or her individual capacity as a police officer for the Pocatello Police Department,<br><br>      Defendants. | Case No. 4:17-cv-00485-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendants, City of Pocatello, City of Pocatello Police Department, Shannon Bloxham, Brandon Vail, Shaun Wright, and Russ Gunter's (collectively "Defendants") Motion for Summary Judgment (Dkt. 21) and Plaintiff Kerry Harmon's Motion for Partial Summary Judgment (Dkt. 22). After these motions were filed—and in response to assertions made in Defendants' submissions—Harmon filed a Motion to Strike (Dkt. 28) and a Motion to Amend/Correct Complaint (Dkt. 29).

The Court held oral argument on July 1, 2019, and took the motions under advisement. For the reasons outlined below, the Court finds good cause to GRANT Harmon's Motion to Amend/Correct, DENY Harmon's Motion to Strike, GRANT Defendant's Motion for Summary Judgment, and DENY Harmon's Motion for Partial

Summary Judgment.

## II. BACKGROUND

### A. Factual Background

In October 2015, the Pocatello Police Department ("PPD") began investigating a complaint that Plaintiff Kerry Harmon had engaged in unlawful telephone harassment. As a result of this investigation, Idaho State Magistrate Judge Steven Thomsen issued a warrant on October 30, 2015, for Harmon's arrest. In his order, Judge Thomsen set a bond amount and initialed the arrest warrant for "nighttime execution"—meaning the warrant could be served at night (i.e., after 8pm). No action was immediately taken as a result of the warrant.

On February 27, 2016, PPD received a complaint from another individual, Cassie Hughes, alleging that Harmon was harassing her via telephone. PPD tasked Officer Brandon Vail with investigating the complaint.

Officer Vail called Harmon multiple times the evening of February 27, 2016, with no response. Finally, Harmon answered the phone, indicated it was late, and told Vail that she would talk to him at a more appropriate time. As part of his investigation, Office Vail learned of the active warrant from October 2015 for similar conduct.

The next evening, February 28, 2016, Officer Vail and Officer Shannon Bloxham went to Harmon's house to follow up on the new complaint of telephone harassment and to serve the outstanding arrest warrant obtained in the prior complaint. When Officers Vail and Bloxham knocked on the door, Harmon's husband, Doug Harmon, initially answered and spoke with the officers. Harmon herself then came to the door, but insisted that she did

not want to speak to the officers.

At some point during the conversation, Harmon attempted to close the door. Both Officers Vail and Bloxham placed a foot into the doorframe to prevent Harmon from closing the door. According to Harmon, Officer Vail said that she "was going to be arrested tonight," and Officer Bloxham stated, "you're going to jail tonight." Dkt. 21-4, at 8. At this point, Officer Bloxham reached out and grabbed Harmon's wrist to place her in handcuffs. Harmon pulled away.

Unbeknownst to Officers Vail and Bloxham, Harmon had recently undergone surgery on her wrist for arthritis. Harmon claims that on the night in question she was wearing a splint. Neither Officer Vail nor Officer Bloxham observed Harmon wearing any type of splint on her wrist and contend that had Harmon been wearing such a device, they would not have grabbed her wrist. Nonetheless, Harmon vehemently contends that she was wearing the split at the time of the incident.[1]

During this same time period, Doug Harmon had called the family's attorney, Greg May. Doug Harmon came back to the door and asked Officer Vail if he would speak to their attorney. Officer Vail declined. Kerry Harmon took the phone from her husband and went into another room to speak to May. She returned, handed the phone to her husband, and went upstairs. PPD Sergeant Derek Daniels then arrived at the scene, spoke with May,

---

[1] There is also a minor dispute about precisely where Harmon was standing when the "arrest" took place. Officers Vail and Bloxham testified that Harmon was outside her residence (i.e., she was on the porch or landing) and that when they attempted to arrest her, she retreated back *into* her house. Dkt. 21-4, at 16, 22. Harmon, on the other hand, contends that she was inside her house and that Officers Vail and Bloxham reached *into* her house when they grabbed her arm. Dkt. 21-4, at 8. While a disputed background fact, this disagreement is not material to any claim at issue in this case.

and made arrangements for Harmon to voluntarily meet law enforcement at the courthouse the following day to sort out the issues. Officers Vail and Bloxham admonished Harmon against communicating with Cassie Hughes—the complainant of the second telephone harassment incident—and left the scene.

Harmon voluntarily presented herself the following day as agreed. The charge stemming from the 2015 incident was ultimately dismissed by the prosecutor. Harmon was also never charged with any crime pertaining to the 2016 complaint made by Cassie Hughes.

**B. Procedural Background[2]**

On November 28, 2017, Harmon filed her complaint, alleging various civil rights violations. Dkt. 1. On July 2, 2018, Harmon filed an Amended Complaint correcting a typographical error of little significance. Dkt. 12. Defendants consented to the amendment and the Court accepted the same. Dkt. 14.

In her Amended Complaint, Harmon alleges seven causes of action under 42 U.S.C. § 1983: (1) a Constitutional violation for unlawful entry, seizure, and arrest; (2) a Constitutional violation for failing to communicate legal justification for an arrest; (3) a Constitutional violation for use of excessive force; (4) a Constitutional violation for malicious prosecution; (5) a Constitutional violation for failure to intervene; (6) a Constitutional violation for failure to train; and (7) a *Monell* claim based on "widespread

---

[2] The Court will address and analyze the substance of the individual motions later in this decision, however, the parties' arguments overlap between the various motions and are intertwined with the filing of yet other motions (often filed simultaneously). Thus, the Court will outline the procedural history of theses motions for clarity and to provide the context for the Court's later discussions.

practices and/or policies" of the Pocatello Police Department.

On May 3, 2019, Defendants moved for summary judgment on all claims. Defendants also asked as part of their motion that the Court dismiss Defendants Brandon Vail, Shaun Wright, and Russ Gunter, asserting that Harmon had failed to allege any facts against them.

On that same day, Harmon moved for partial summary judgment on three claims. First, citing *Monell*, Harmon moved for summary judgment because "there are no genuine issues of material fact that the City of Pocatello had implemented an unconstitutional policy of having day officers (who had no knowledge of the facts) make affirmative misrepresentations and/or omit material facts in probable cause affidavits to obtain warrants." Dkt. 22-1, at 2. Harmon also moved for summary judgment on her claim for unlawful arrest (Claim 1), and her claim for malicious prosecution (Claim 4).

In response to Defendants' Motion for Summary Judgment—aside from arguing substantively against the arguments presented—Harmon agrees that the Court can dismiss Russ Gunter as a defendant, but contends that she properly identified Brandon Vail and Shaun White as defendants and that she has alleged sufficient facts against each of them to justify their inclusion in this suit. As part of this argument, Harmon postures that even if the Complaint is deficient as to these individuals, since Defendants are asking the Court to *dismiss* these defendants, the Court should give her an opportunity to amend her Complaint.

In response to Harmon's Motion for Partial Summary Judgment, Defendants firmly reject Harmon's characterization of the first "claim" for which she seeks summary judgment—regarding PPD's allegedly unconstitutional policy for obtaining warrants. In

their estimation, none of the seven claims identified in the complaint relate to a constitutional violation pertaining to the method used to obtain the warrant for her arrest. In other words, Defendants contend that Harmon is moving for summary judgment on a claim that does not exist—a claim she never pled and that they never received notice of. In support of their arguments, Defendants filed the affidavit of Office Shaun White—the officer who executed the probable cause affidavit used to procure the arrest warrant back in 2015—discussing the process and procedures PPD followed in obtaining warrants. Defendants then explain that there were no widespread policies of abuse, let alone constitutional violations, in the manner in which the department performed these tasks.[3]

In their Reply Memorandum to their own Motion for Summary Judgment filed the same day, Defendants firmly reject the idea that Harmon can amend her Complaint at this late stage (to plead additional facts against Vail and White) asserting that she has not shown good cause to amend as required by Federal Rule of Civil Procedure 16(b).

In her Reply Memorandum to her Motion for Partial Summary Judgment, Harmon first asserts that Defendants never technically answered her Amended Complaint and therefore cannot move for summary judgment on any claims or to dismiss any defendants, and that Defendants' failure to Answer constitutes acquiescence on all claims. Harmon then addresses the three causes of action that she seeks summary judgment on from the Court.

---

[3] It is not entirely clear, but it appears PPD has altered their practice for swearing out warrants since 2015. There is no indication, however, that PPD implemented these new procedures to correct errors or unconstitutional practices, but simply as a matter of routine policy and procedure improvement.

In conjunction with her Reply, Harmon also filed a Motion to Strike and a Motion to Amend Complaint. In the Motion to Strike, Harmon alleges that Officer Shaun White's affidavit filed by Defendants in opposition to her Motion for Summary Judgment is a sham affidavit that contradicts his prior deposition testimony. In her Motion to Amend, Harmon rebuffs Defendants' contention that her "how the warrant was obtained" claim is some type of new claim, but, nonetheless, formally asks the Court for leave to Amend her Complaint to add this additional claim. Harmon argues that while the details of how the probable cause affidavit was obtained in 2015 did not come to light until recently, she has always asserted that that Defendants obtained the warrant without legal justification. Further, since Defendants never identified any confusion regarding her pleadings until summary judgment, Harmon claims she was unaware that they considered the pleadings inadequate. Finally, Harmon chastises Defendants for holding her feet to the fire in amending when they themselves failed to Answer her Amended Complaint.

In response to Harmon's Motion to Strike, Defendants claim that, in accordance with the 2010 Amendments to Rule 56, it is unnecessary to file a separate motion to strike material deemed improper at summary judgment, but that any such argument should simply be included in moving papers for the motion itself. *See* Fed. R. Civ. P. 56 (c)(2) Committee Notes. Defendants claim that because Harmon already exceeded the ten-page briefing requirement in her reply brief, she needed another avenue to address this issue and improperly chose to file a motion to strike. Defendants then substantively respond to Harmon's motion arguing that Officer White's affidavit does not contradict his prior statements, but merely clarifies them.

In response to Harmon's Motion to Amend, Defendants reiterate that Harmon has not met the requisite good cause standard to permit amendment. Additionally, Defendants explain that when Harmon previously Amended her Complaint, it was to correct a typographical error and because nothing substantive changed, Defendants determined filing an Answer was unnecessary. Nevertheless, Defendants filed—the same day as this response—an official Answer. Defendants' Answer to the Amended Complaint is identical to their previously filed Answer in response to Harmon's original Complaint.

Harmon chose not to reply to her Motion to Strike Officer Wright's Affidavit, replied to her Motion to Amend by reiterating her same arguments, and filed an Objection to Defendants Amended Answer claiming it is untimely.

All matters are now before the Court and the Court will consider each in due course. Problematic here, is the simple fact that with so many motions, cross-motions, and issues—all being taking up simultaneously and/or in response to other motions—organization is difficult. Accordingly, the Court will address the procedural issues first and then discuss the substance of the relevant Motions for Summary Judgment.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving

party's favor." *Id.*

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment do not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.,* 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). That said, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## IV. ANALYSIS

Defendants begin their Motion for Summary Judgment by asking the Court to dismiss Defendants Vail, Wright, and Gunter. Defendants claim that Harmon has failed to plead sufficient facts against each to support any of her causes of action. As for Russ Gunter, Harmon agrees that the Court can dismiss him from the case. Dkt 23-1, at 2.

Accordingly, this portion of Defendants' Motion is GRANTED and Russ Gunter is DISMISSED as a defendant in this suit.

As for Wright and Vail, Harmon explains that while her Complaint is "admittedly not a great work of art" she has "allege[d] facts which identify both Shaun Wright and Brandon Vail." Dkt. 23-1, at 4. She claims that Officer Wright is the Officer who swore out the probable cause affidavit to obtain an arrest warrant for Harmon in 2015, and that Officer Vail was one of the Officers who went to Harmon's house the night of the incident in 2016. Harmon claims that while the detailed roles Wright and Vail played in the case have only recently come to light, the Defendants were squarely on notice of the claims against these individuals.

The Court disagrees. While it is true that Wright and Vail are each mentioned eight times in Harmon's Amended Complaint, each of those references is to their relationship with each other or to other defendants—broadly, they are some of the "Officers" or "Defendants" involved in the case. Harmon, however, does not actually allege any specific *facts* against either of them. Furthermore, to claim that recent depositions have confirmed the roles these defendants played, or that "in context . . . in light of discovery and the information provided to this court," it is "clear that Plaintiff stated claims" against Wright and Vail, is akin to post hoc analysis. Presumably, this is one of the reasons Harmon now moves to Amend her Complaint to identify Wright 15 additional times and Vail 21 additional times, and explain their specific and detailed roles in the events at issue.

Harmon's deficiencies aside, the Court finds itself in a quandary. Under well-established Ninth Circuit precedent, the Court must allow a party an opportunity to amend

when it grants a Motion to Dismiss unless it is clear the complaint's failures cannot be cured. *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (internal citation omitted) ("Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment."). Here, it is clear Harmon *could cure* her Complaint—after all, the Court has already seen the proposed Second Amended Complaint and it accurately identifies Wright and Vail. Thus, should the Court Dismiss and allow amendment just for the sake of the standard? This hardly seems necessary.

The Court does not look favorably on hindsight justification, but the fact is, the parties pursued litigation knowing full well that Wright and Vail played a role in the events although the extent of their involvement was fleshed out over time. Said differently, the parties have pursued this litigation seemingly in sync—not in factual agreement of course, but at least in scope (after all, Wright and Vail were both deposed during discovery)—but now Defendants claim that Harmon's pleadings are insufficient. To be sure, the Court does not agree with Harmon that Defendants should have moved for a more definite statement rather than a motion to dismiss. The burden was Harmon's and she should have alleged more detailed facts in her Complaint. That said, Defendants could have moved to dismiss at any time prior to this point. The Court likely would have granted the motion and given Harmon leave to amend. Harmon would then have filed an amended complaint (similar to what is now before the Court), and the case would have ended up at this exact point all the same—but arguing this now is too little too late and appears to be nothing more than an ploy by Defendants to limit Harmon's claims knowing full well that the people they seek to dismiss play a critical role in the facts of this case.

As Harmon indicates—and the Court can confirm—it is not uncommon for a Plaintiff to list "Does," "Officers," or other general categories of defendants in his or her lawsuit. A Plaintiff may not know exactly who was involved, and how, until at least some limited discovery has taken place. In this case, it appears that the parties did not take the depositions of Wright and Vail until *after* the deadline to amend had already passed. There was, therefore, no way for Harmon to Amend her Complaint within the prescribed timeframe without seeking leave of the Court. Accordingly, the Court will GRANT Harmon's Motion to Amend to clarify the roles of Wright and Vail. In this manner, the Court will avoid delay and be able to address all pending motions against all Defendants ensuring the "just, speedy, and inexpensive determination of [this] . . . proceeding." Fed. R. Civ. P. 1.

For the sake of organization, the Court must jump briefly to Harmon's Motion for Partial Summary Judgment which addresses the second reason Harmon seeks to amend—other than adding allegations against Wright and Vail—which is to officially add her "how the warrant was obtained" claim.

In her Motion for Summary Judgment, Harmon suggests for the first time that the City of Pocatello implemented an unconstitutional policy—referencing her *Monell* claim (Claim 7)—". . . of having day officers make affirmative misrepresentations and/or omitting material facts in their probable cause affidavits." Dkt. 22-1, at 3.

Defendants argue that this is not an official "claim" in Harmon's Complaint because there is not a "single sentence, statement, series of words, or other allegation" "pertaining to the method used to obtain the warrant for her arrest." Dkt. 24, at 4-5. Defendants position

is that Harmon has failed to plead this "claim" and that the Court should dismiss it outright. The Court disagrees. Again, as noted above, Harmon could have been more detailed in her Complaint; however, contrary to Defendants' assertions, Harmon has plead this claim—or at least this concept—to a sufficient degree that Defendants were on notice.

In her Amended Complaint, as part of Claim 2 regarding unreasonable searches and seizures, Harmon alleges that "Defendants acted under color of state law when they violated Mrs. Harmon's constitutional rights through conduct which included . . . arresting Mrs. Harmon without providing or communicating any legal justification for the arrest." Dkt. 12, at 9.[4] Additionally, under Claim 7 (the *Monell* Claim) Harmon reincorporates the preceding paragraphs[5] and alleges that the City of Pocatello's "policies were the moving force behind the violation of Mrs. Harmon's federal[ly] protected rights." Dkt. 12, at 13.

Again, while Harmon's Complaint is not an outstanding example of clarity, Defendants were sufficiently on notice that Harmon had a *Monell* claim and that the basis of that claim related to practices and procedures touching upon the [alleged] unconstitutionality of her arrest. While the language of Harmon's Complaint is broad and, at first glance, appears to apply more to how PPD executed the warrant, it is not a stretch

---

[4] *See also* Dkt. 12, at 8 (Claim 1 asserting Defendants' violated Harmon's rights "*without legal justification*").

[5] The Court only mentions this because, as the Court has explained before, under the principle of incorporation, allegations in one area of a Complaint that support the individual causes of action (even if not reiterated in each cause of action) are sufficient under *Iqbal* and *Twombly. See Sagastume v. RG Transportation, Inc.*, No. 4:18-CV-00361-DCN, 2019 WL 2218986, at *8 (D. Idaho May 21, 2019) (finding that while Plaintiff had not stated a particular fact in a certain section of his complaint, this omission did not warrant dismissal of that claim as it was stated elsewhere and Plaintiff had incorporated those paragraphs in the relevant section).

to include the method for how PPD obtained the warrant—after all, the probable cause affidavit is the basis for the arrest warrant itself. Defendants' argument is further undercut by the fact that discovery has already occurred on this very topic, depositions have been taken, and they have thoroughly responded to Harmon's Motion.

That said, Defendants felt the need to file an additional affidavit from Officer Wright clarifying and expanding upon his prior testimony. This action supports the idea that Harmon's motion caught Defendants off guard. As already explained, however, even were the Court to dismiss this "claim," it would do so without prejudice, allow Harmon an opportunity to Amend, and—full circle—the Court would be right back where it started: determining if Summary Judgment is proper on this claim.

In short, the Court will GRANT Harmon's Motion to Amend Complaint in order to clarify the factual contentions supporting her *Monell* claim as well. While the deadline has long since passed, Harmon has shown good cause to amend even at this late stage. Defendants cannot show any real prejudice because *they have already performed discovery on these topics and responded substantively to the arguments raised.* Part of the Court's rational for allowing amendment is to give Harmon the broadest possible base in support of her claims, construing all factors in the light most favorable to her. Having considered the allegations in the Second Amended Complaint, all of the evidence is now before the Court and it can make a reasoned determination on all claims *and issues* the parties have presented for adjudication.

### A. Defendants' Motion for Summary Judgment

Defendants seek summary judgment on all claims in Harmon's Amended

Complaint; however, they group their arguments together on some claims. Additionally, there are sub-topics within certain claims that require special attention.

The Court will address each argument in turn—as that is how Defendants presented them, and how Harmon responded—and will take up any ancillary issues along the way.

*1. Valid Warrant (Claims 1, 2, 4)*

First, Defendants argue that summary judgment is proper on Harmon's claims of unlawful entry, seizure, arrest, and malicious prosecution because they had a valid arrest warrant establishing probable cause to initiate Harmon's arrest (Claims 1, 2, 4).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A search and/or seizure is reasonable when probable cause is established by a valid warrant. U.S. Const. Amend. IV. Probable cause for an arrest exists where the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect has committed, or is committing, an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

Defendants begin by arguing that there was nothing improper about their behavior against Harmon because they were in possession of a valid arrest warrant supported by probable cause. Defendants then argue that they did not violate Harmon's constitutional rights because they never actually deprived her of her liberty since they never actually arrested her.

a. Probable Cause

Defendants give little weight to the probable cause issue as they appeared to believe—at the time they filed their original motion for summary judgment—that this was not a contested issue. When Harmon filed her Motion for Summary Judgment, however, outlining the issue of probable cause as her main concern, Defendants substantively responded. The Court will, therefore, address this more fully below when discussing Harmon's motion.

Suffice it to say, the Court finds that Defendants did have probable cause to arrest Harmon. Even if the Court were to find fault with the probable cause affidavit—leading to the conclusion that Harmon had not committed any offense worthy of an arrest warrant— the applicable standard is not whether a suspect actually committed an offense, but whether a reasonable officer *had probable cause to think* the suspect could have committed the offense. *Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007). In other words, invalidating the warrant now would not invalidate the Defendants' actions then. On the evening in question, Defendants had, to the best of their knowledge, a valid arrest warrant and were allowed to execute it.

In response to Defendants' Motion for Summary Judgment on this claim, Harmon asserts that not only did the Defendants lack probable cause for the warrant, but they also failed to produce the actual warrant when she requested it and/or failed to explain why they were placing her under arrest. Harmon contends that these failures also violated her rights.

b. "Show the Warrant"

Harmon suggests Officers Vail and Bloxham acted unconstitutionally because they did not physically show her the warrant when she asked to see it.

Idaho Code outlines that "If the person making the arrest is acting under the authority of a warrant, he must show the warrant, if required." Idaho Code § 19-609. Harmon's reliance on this statute is complicated at best. First, the Idaho Supreme Court has never interpreted this statute—specifically what the language "if required" means. It is unclear whether the "requirement" to show the warrant comes from the warrant itself, the nature of the underlying crime, or the person requesting it.[6]

The second problem with Harmon's reliance on Idaho Code section 19-609 is that the present case does not involve any state law claims. It is solely a Federal Civil Rights case; therefore, substantive Idaho state law does not apply. Defendants (somewhat ironically) allege that instead of Idaho Code section 19-609, Idaho Rule of Criminal Procedure 4 should apply in this circumstance which states that: "The officer need not have the warrant in possession at the time of the arrest, but the officer must show the warrant to the defendant *as soon as possible*." Idaho Rule Crim. P. 4(e)(3) (emphasis added).[7] Harmon

---

[6] For example, an Alaskan Territorial statute from almost 100 years ago read that officers "must also show the warrant if required *by the defendant*." *United States v. Pappadementro*, 6 Alaska 769, 770 (D. Alaska 1922) (emphasis added). Another reasonable interpretation, however, is that an officer is required to produce the warrant if the validity of the arrest depends exclusively upon that specific warrant. *See e.g., State v. Cook*, 663 P.2d 20, 21 (Okla. 1983) (superseded by statute) ("where the validity of the arrest depends upon a warrant, the [Oklahoma] legislature has clearly conferred upon the person the right to see the written authority of the officer: 'The officer must ... show the warrant if required.'"). By way of illustration of this interpretation: if an officer making a routine traffic stop learns of an outstanding warrant (for unrelated conduct), he need not wait for physical possession of the warrant to execute on it; however, if an officer is arresting someone for the offense solely outlined in the warrant (and the person is compliant and asks to see the warrant) he must present it. Other states have statutes similar to Idaho Code section 19-609, but what little caselaw exists on these statutes is varied and ultimately inapplicable here.

[7] Federal Rule of Criminal Procedure 4 is substantially similar:

counters that this rule is inapplicable as it is only a procedural rule during litigation—specifically in *criminal cases*. While these observations may be true, that does not necessarily preclude the rule's application in a civil case that is based upon the underlying failure to properly execute a warrant in a criminal case. This too is how Defendants justify using an Idaho Rule in support of their argument, while condemning Harmon's similar use of an Idaho Statute: because the underlying actions of the officers themselves were related to Idaho State criminal matters, Idaho State criminal rules would apply, whereas Idaho Code section 19-609 does not apply because statutorily there are no Idaho State causes of action in this case. These arguments may be missing the forest for the trees, but the Court is somewhat persuaded by the language of Idaho Rule of Criminal Procedure 4. Ultimately, however, neither side has convinced the Court as to the appropriate standard.[8]

Critically, it is not entirely clear that Harmon *actually asked to see the warrant* on the night in question. Although, in her briefing, Harmon repeatedly suggests that she

---

> Upon arrest, an officer possessing the original or a duplicate original warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged and, at the defendant's request, must show the original or a duplicate original warrant to the defendant as soon as possible.

Fed. R. Crim. P. 4(c)(3)(A)

[8] While both parties cite cases in support of their varying interpretations, the Court notes that some assertions are taken out of context, some are blatantly wrong, and most are simply inapplicable. Broadly and pragmatically speaking, however, it would often be difficult to require that an officer must show a defendant an arrest warrant before executing on it. First, an Officer may not have a way to get a copy of the warrant (for example, in the routine traffic stop that alerts Officers to outstanding warrants from other jurisdictions). More importantly, however, for safety reasons, Officers may not be able to show a copy of the warrant to an individual until he or she in custody and either in a vehicle or at a police station. As will be explained below, the Court does not make a conclusive ruling on this issue at this time.

"clearly asked to see the warrant" (Dkt. 23-1, at 12) and "asked if they had a warrant" (Dkt. 22-1, at 13) there is little support for this in the record. Harmon does not cite to an affidavit or any other specific evidence to support this assertion, but instead points broadly to one part of her deposition—page 64. Her statement there reads in full:

> They demanded to talk to me. Again, I refused, at which point the elbows went in to the open door jamb on both sides. I was getting very frustrated. I said, "*you don't have a warrant*. This is ridiculous. I'm not going to talk to you now. You need to come back at a more appropriate time."

Dkt. 22-2, at 6, ll. 15-20 (emphasis added).[9] Although she does not cite such testimony, also of note is Harmon's response in her deposition on cross-examination:

> Q. You didn't mention this earlier when you went through your description of what occurred between you and the police officers, but I know that it's in your complaint that you allege that you asked to see a warrant and were refused. Is that not the case?
> A. That is the case, yes.
> Q. You're saying that you did request to see a warrant?
> A. Yes.
> Q. And what was the response that you got?
> A. That there wasn't one.
> Q. Who told you that?
> A. Vail.

---

[9] Harmon also claims the officers never even told her there was a warrant until *after* they tried to arrest her. The testimony on this issue is conflicting. It appears these specific events (explaining there was an outstanding warrant and trying to make an arrest) occurred in a manner of seconds, with multiple people shouting and moving about. Regardless, even if Harmon had asked to see the warrant, officers were not required to show it to her before attempting to arrest her. *See, e.g., State v. Layman*, 42 P.2d 201, 202 (N.M. 1935) ("It is beyond question that, in making an arrest by virtue of a warrant, the officer cannot be required to show the warrant, or state the substance of it, until the arrest is accomplished."). After exhaustively reviewing all deposition testimony, it appears that following an initial investigation into the telephone harassment allegations, Officers told Harmon there was an active warrant and tried to arrest her as she was retreating into her house and saying "No, I don't [have an arrest warrant]." Dkt. 23-3, at 66, 78, 116. Harmon then asked what the warrant was for, to see the warrant, and the Officers explained the basis for the warrant. *Id.* at 105, 116.

Dkt. 23-3, at 181. Interestingly, it is Officer Bloxham's testimony that offers a better picture of these events. Officer Bloxham states in her deposition that "they [the Harmons] didn't start demanding to see the warrant until they were told she had a warrant and that she was going to be placed under arrest." Dkt. 22-2, at 41, 43. Officer Vail does not recall whether the Harmons asked to see the warrant. Dkt. 23-3, at 114.

Simply put, Harmon argues that she asked to see the warrant, but it is unclear that actually happened.[10] If Harmon did not ask to see the warrant, Officers Bloxham and Vail would have been under no obligation to show it to her. *See, e.g., Carlisle v. State*, 319 N.E.2d 651, 653 (Ind. App. 1974) (finding the police were under no obligation to show warrant when defendant "did not request that he be permitted to view the warrant"); *accord People v. Thomas*, 318 P.2d 780, 782 (Cal. App. 1957).

However, even assuming Harmon asked to see the warrant, the Court need not definitively rule on whether Officers Vail and Bloxham were required to have it in their physical possession and show it to Harmon for two reasons. First—as will be explained in the following section—*an arrest did not occur here*. Accordingly, it is not clear that Idaho Code section 19-609 or Idaho Rule of Criminal Procedure 4 are even relevant as both apply to actions when making an arrest. Second, and most importantly, Officers Bloxham and Vail are entitled to qualified immunity.

---

[10] The Court is not calling into question Harmon's credibility—it will construe this fact in her favor— however, it seems if there were clear evidence of this, Harmon would have pointed it out in her briefing.

The purpose of the doctrine of qualified immunity is to shield public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Qualified immunity is designed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Here, Harmon has not met her burden in proving that she had a constitutional right to see a copy of the warrant and that this right was clearly established. In light of the differing state statutes and rules, and the outstanding question of their applicability in this case, the Court finds that Defendants did not violate a "clearly established right" by failing to show Harmon the warrant. The Officers actions were not egregious or unconstitutional and each is entitled to qualified immunity on this difficult question.

c. "Explain Arrest"

In a similar vein, Harmon contends that Defendants failed to explain the purpose, or basis, for the arrest warrant and that this failure also violated her constitutional rights. The Court finds this argument unpersuasive.

Idaho Code section 19-608 outlines that "The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the

authority to make it . . ." Again, the applicability of Idaho State Statutes is questionable, but importantly, under federal precedent from the Ninth Circuit, the Fourth Amendment *does not* provide a suspect the right to be informed the reason for arrest until the government has committed itself to prosecution. *See e.g. Coulson v. Washoe Cty.*, 69 F.3d 543 (9th Cir. 1995) (citing *Kladis v. Brezek*, 823 F.2d 1014, 1018 (7th Cir. 1987)).

That said, in the instant case, Officers Vail and Bloxham did actually tell Harmon what she was going to be arrested for—albeit not in great detail. Dkt. 23-3, at 67, 116. For these two reasons, the Court will dismiss this argument.

d. "Under Arrest"

Many of Harmon's arguments hinge on her assertion that she was unlawfully placed under arrest. For their part, Defendants contend that although they unsuccessfully attempted to initiate an arrest, they did not actually do so and that Harmon was never deprived of any of her rights. Under the circumstances, the Court must agree.

As previously noted, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California,* 551 U.S. 249, 254 (2007).

Harmon alleges that she was under arrest (i.e. "seized" for purposes of Fourth Amendment analysis) when Officer Bloxham tried to grab her arm and she (Harmon) pulled away. Harmon admits that Bloxham was the only officer she came in physical

contact with and that Bloxham "grabbed [her] wrist" and "attempt[ed] to pull [her] through the door." Dkt. 23-3, at 182.

For her part, Officer Bloxham claims that she "grabbed at her. I would imagine there was probably a brushing. But at no point did I have positive control of her arm." Dkt. 23-3, at 66. The following exchange from Officer Bloxham's deposition expounds upon the circumstances:

Q. So you did make contact with and grab the wrist?
A. Yes. I've already said yes to that.
Q. And then she pulled back?
A. Yes.
Q. And so what you're saying by "control" is that she was simply able to get away from your grip; correct?
A. Yes.

Dkt. 23-3, at 69.

Relying on the United States Supreme Court in *Brower v. Cty. Of Inyo*, 489 U.S. 593 (1989), Defendants argue that a "violation of the Fourth Amendment requires an intentional acquisition of physical control." *Id.* at 596. Defendants point out that when Officer Bloxham reached out to arrest Harmon, she pulled away, retreated to a back room of her home, and then ultimately went upstairs without their interference. In their estimation, these actions demonstrate that the Officers had not restrained Harmon's movement and there was thus no arrest nor seizure.

Harmon, on the other hand, cites to a United States Supreme Court case from two years later in which the high Court found that "[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him." *California v. Hodari D.*,

499 U.S. 621, 624, (1991). Defendants take issue with this citation asserting that it is merely dicta; that the Supreme Court was quoting an 1862 Massachusetts State Supreme Court case (*Whitehead v. Keyes,* 85 Mass. 495, 501 (1862)) but that the United States Supreme Court did not actually accept or adopt this reasoning. The Court disagrees—at least in form.

The Supreme Court in *Hodari* began this particular discussion by noting that "for most purposes at common law, the word [seizure] connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control." *Id.* Critically, however, the Court then went on to say that in order to "constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—*the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.*" *Id.* (emphasis added). Ironically, it was only then that the Court cited *Whitehead.* In short, the Court disagrees that this concept was merely dicta, as Defendants assert. It appears clear that *Hodari* held that even a failed arrest would constitute an arrest.

That said, in 2007, the United States Supreme Court took up *Brendlin v. California*, a case in which it determined that "[a] police officer may make a seizure by a show of authority and without the use of physical force, but there is *no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned*." 551 U.S. 249, 254 (2007) (emphasis added).

Some courts have addressed this seeming disconnect in Supreme Court case law.[11] In *Brooks v. Gaenzle*, a plaintiff brought a § 1983 action against officers alleging unreasonable seizure and excessive force when officers shot him as he fled the scene of a violent crime. The Tenth Circuit ultimately determined a seizure had not occurred because although the plaintiff had been shot, he continued to flee and was not stopped by the officers. 614 F.3d 1213 (10th Cir. 2010). In *Brooks*, the Tenth Circuit rejected the Plaintiff's argument that *Hodari* stood for the proposition that a suspect is seized merely because physical force, though unsuccessful, was applied. In discussing *Hodari*, the Tenth Circuit outlined a critical qualifying statement from the *Hodari* decision:

> We have consulted the common-law to explain the meaning of seizure.... [and] neither usage nor common-law tradition makes an attempted seizure a seizure. The common law may have made an attempted seizure unlawful in certain circumstances; but it made many things unlawful, very few of which were elevated to constitutional proscriptions.

*Id.* at 1221 (quoting *Hodari,* 499 U.S. at 626 n. 2). Ultimately, the Tenth Circuit determined that "when read in context and its entirety, *Hodari* clarifies that a seizure cannot occur unless a show of authority results in the suspect's submission." *Id.* "[A] seizure requires 'intentional acquisition of physical control' and occurs when 'a person [is] stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.*

---

[11] The Supreme Court itself has clarified its holding in *Hodari* noting that in the *Hodari* case, the Court was focused on the proposition that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment" and that its common law discussion in that case regarding what may or may not constitute a seizure merely illustrated the principle that "attempted seizures of a person are beyond the scope of the Fourth Amendment." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

(quoting *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010)). There simply is no seizure without submission and termination of movement, and the Fourth Amendment may "not be stretched to cover attempted seizures . . . ." *Id.* at 1222. The Court finds the Tenth Circuit's analysis helpful and its reasoning persuasive in the present case.

Importantly, the Ninth Circuit has also ruled that "[a] seizure occurs either when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority." *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir. 1994) (*citing Hodari)*, as amended (Sept. 21, 1994).

Thus, *Hodari* and *Brendlin* are not incongruent, but work together to illustrate that while it is true a mere touching or grasping could be considered a seizure under the Fourth Amendment, it is only so if the action actually accomplishes the task of submission. In other words, a touch, grasp, or brushing is not a seizure unless it subjects a person to "governmental termination of freedom of movement through means intentionally applied" (*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989)) or in some way restrains his or her physical liberty (*Terry v. Ohio*, 392 U.S. 1, 19 (1968)). *See also Farrell v. City of New York*, No. 15 CIV. 8401 (PAE), 2018 WL 944400, at *8 (S.D.N.Y. Feb. 15, 2018) (finding that "although 'mere grasping or application of physical force' may constitute an arrest, *Hodari D,* 499 U.S. at 624, such contact does not *necessarily* rise to that level")*; cf. Graham v. Connor,* 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal citation and quotation marks omitted)).

Numerous circuits since *Hodari* have also clarified and interpreted "Supreme Court precedent as requiring intentional termination of movement or acquisition of physical control in flight situations, regardless of the force applied." *Brooks,* 614 F.3d at 1221–22 (further clarifying that " none of our holdings suggest the mere use of physical force or show of authority alone, without termination of movement or submission, constitutes a seizure."); *United States v. Bradley,* 196 F.3d 762, 768 (7th Cir.1999) (holding "there must be either a show of authority or a use of force" which "must have caused the fleeing individual to stop attempting escape"); *United States v. Hernandez,* 27 F.3d 1403, 1405, 1406–07 (9th Cir.1994) (determining no seizure occurred when officer grabbed suspect, a struggle ensued, and suspect fled, as he "was not seized because he never submitted to authority, nor was he physically subdued" and further holding "[a] seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective").

In the present case, even though Officer Bloxham made physical contact with Harmon, she did not effectuate an arrest. Harmon retreated into her house, moved about freely, called her attorney, and eventually went to bed. At no time was Harmon under the control—either physically, or by yielding to a show of authority—of the officers. Officer Bloxham never restrained Harmon's movement, nor her liberty. Under the circumstances, the Court finds that an arrest did not occur. Summary judgment is appropriate on this claim.

e.  Malicious prosecution

Similarly, Harmon cannot support a claim for malicious prosecution because she was never actually prosecuted. To succeed on a claim for malicious prosecution, a plaintiff

must show "that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 919 (9th Cir. 2012) (citing *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

Here, Harmon's claim of malicious prosecution fails because she was never prosecuted with respect to Cassie Hughes' complaint. No citation was issued, and no charges were ever filed against Harmon based on Hughes' 2016 complaint of telephone harassment. Furthermore, while it is true the Officers went to speak with Harmon about Hughes' complaint, they did not attempt to initiate an arrest based on Hughes' complaint, but rather attempted an arrest pursuant to the outstanding warrant from the 2015 allegations of telephone harassment. Prosecutors ultimately dropped those charges as well.

All of Harmon's allegations *in this lawsuit* arise from the Officers' investigation of Hughes' complaint. Consequently, because Harmon was not prosecuted in any way based on Hughes' complaint, she cannot possibly have a claim for malicious prosecution.

Moreover, even if Harmon had alleged a claim for malicious prosecution with respect to her prior charge for telephone harassment—stemming from the original arrest warrant in the 2015 case, as will be explained in greater detail below, she cannot establish a lack of probable cause. This is fatal to Harmon's malicious prosecution claim. Specifically, with respect to the 2015 charges, there was a valid warrant establishing probable cause to arrest Harmon for telephone harassment. The fact that those charges were later dismissed does not signify any type of malicious prosecution, but only that the prosecutor decided to drop the charges.

Harmon counters that Defendants are missing the mark in their arguments and that "prosecution" is not simply formal prosecution in the court system, but prosecution in the general sense of the word—including everything that leads up to formal court proceedings. According to Harmon, the deficient affidavit, officers coming to her house, the attempted arrest, and the surrounding events all fall under the "prosecution" umbrella. Harmon does not provide caselaw to support this proposition and the Court is unaware of any.

The Court is not saying Harmon's argument is wholly without basis, because there are cases which appear to broaden "prosecution" as widely as Harmon suggest. *See, e.g., Van Audenhove v. Perry*, 11 Cal. App. 5th 915, 922 (Ct. App. 2017), *as modified* (June 14, 2017), *review denied* (Aug. 9, 2017) ("Malicious prosecution is procuring the arrest *or* prosecution of another under lawful process, but from malicious motives and without probable cause. An arrest warrant constitutes criminal process." (internal citations and quotations omitted)).

Other courts, however, have determined the lines do not blur as much as Harmon suggests:

> A false arrest claim, which is based on the Fourth Amendment, "provide[s] remedies only for detention that occurs before formal charges kick off an actual prosecution." *Julian,* 732 F.3d at 846–47; *see also Wiley v. City of Chicago,* 361 F.3d 994, 998 (7th Cir.2004) ("[T]he scope of a Fourth Amendment claim is limited up until the point of arraignment; 'the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects.'"). On the other hand, a malicious prosecution claim, which is based on the denial of the right to procedural due process protected by the Fourteenth Amendment, "provides a remedy for a deprivation of liberty *pursuant to legal process." Serino v. Hensley,* 735 F.3d 588 (7th Cir.2013)

*Starks v. Moore*, No. 1:12-CV-1008-WTL-DML, 2015 WL 1825905, at *3 (S.D. Ind. Apr. 22, 2015).

Regardless of how broadly or narrowly the Court approaches the subject of malicious prosecution, the fact remains that not only was Harmon not prosecuted for either charge, she was not arrested on either charge as well. She was merely investigated. Additionally, as the Court will explain below, Officers were justified in their actions and did not pursue Harmon "with malice," "without probable cause," and "for the purpose of denying [her] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto,* 368 F.3d 1062, 1066 (9th Cir.2004). Summary judgment is, therefore, appropriate on this claim.

### 2. *Excessive Force (Claim 3)*

Defendants next allege that summary judgment is appropriate on Harmon's excessive force claim because she cannot establish the force used was unreasonable. Simply put, Harmon alleges that Defendants used unreasonable force in their arrest attempts in light of the fact that she was wearing a splint on her wrist from a recent surgery dealing with arthritis.

Harmon testified that following this incident, she had to wear splints on her wrist for longer than she was expecting (approximately 8 additional weeks) and that she took some medications and participated in physical therapy.[12] Dkt. 23-3, at 184. Harmon did not require any further surgeries. *Id.*

---

[12] It is not entirely clear, but it appears Harmon was already attending physical therapy and taking medications, but that this incident "exacerbated" her condition. Dkt. 23-3, at 184.

Courts use the reasonableness test of the Fourth Amendment when analyzing a claim of excessive force incident to an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989). When weighing an excessive force claim, summary judgment is appropriate if the Court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was *objectively reasonable under all circumstances*." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (emphasis added). When considering this question, the Court must be cognizant that all determinations of unreasonable force "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 914 (quoting *Graham*, 490 U.S. at 396-97) (internal quotations omitted). "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, at 396.

Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal. *Brissett v. Paul*, 141 F.3d 1157 (4th Cir.1998); *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir.1990) (same); *Martin v. Gentile*, 849 F.2d 863, 869–70 (4th Cir.1988) (same). Moreover, even if serious injuries result from normal handcuffing techniques due to a preexisting condition, there can be no constitutional violation unless officers knew of the condition. *Rodriguez v. Farrell*, 280 F.3d 1341, 1351–53 (11th Cir. 2002).

In *Rodriguez*, the evidence established that officers "grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff

as plaintiff fell to his knees screaming that [the Officer] was hurting him." *Id.*
Unfortunately, the plaintiff had recently undergone elbow surgery, and as a result of the
handcuffing, the plaintiff experienced "loosening of the internal surgical hardware . . . .
The resulting complications included more than twenty-five subsequent surgeries and
ultimately amputation of the arm below the elbow." *Id.* Although the plaintiff in *Rodriguez*
experienced serious injury from his arrest, with respect to his claim of excessive force, the
Eleventh Circuit determined that:

> . . . Rodriguez's earlier surgery made what otherwise would be a common
> non-excessive handcuffing technique (that ordinarily would be painful but
> cause minimal injury) a maneuver that caused severe injury and tragic
> results. This distinction, however, is not important legally and does not
> preclude a conclusion that Rodriguez has shown no constitutional violation:
> no evidence has been presented that Sgt. Farrell knew of plaintiff's recent
> elbow surgery or, more important, knew that handcuffing plaintiff would
> seriously aggravate plaintiff's preexisting condition. *We do not use hindsight
> to judge the acts of police officers; we look at what they knew (or reasonably
> should have known) at the time of the act.* What would ordinarily be
> considered reasonable force does not become excessive force when the force
> aggravates (however severely) a pre-existing condition the extent of which
> was unknown to the officer at the time.

*Id.* (emphasis added).

Similarly, this Court recently dismissed a plaintiff's claim of excessive force when
he alleged that he was "cuffed with such force that it tore [his] shoulder tendons." *See
Thomas v. Cassia Cty., Idaho*, No. 4:17-CV-00256-DCN, 2019 WL 938385, at *7 (D.
Idaho Feb. 26, 2019). In that case, the Court determined the use of force amounted to a
"non-violent handcuffing, carried out in a reasonable manner" and that there was no
indication the officer was aware of a preexisting shoulder condition when they placed the
Plaintiff in handcuffs. *Id.* "Simply placing an arrestee in handcuffs to be transported to the

police department—even when the arrestee is being compliant—is a reasonable safety precaution that the government has an interest in performing to protect themselves and others." *Id.* at *8 (*citing LaLonde v. County of Riverside*, 204 F.3d 947, 964 (9th Cir.2000) ("Handcuffing an arrestee is standard practice, everywhere.")).

In this case, Officer Bloxham used minimal force when attempting to initiate Harmon's arrest. Officer Bloxham reached out to grab Harmon's arm to secure her arrest, but Harmon pulled away and Bloxham was unable to gain positive control of her. Dkt. 21-4, at 22. Harmon testified that when Officer Bloxham grabbed her wrist, "I, of course, knee-jerk reaction, pulled back . . . ." Dkt. 21-4, at 8. Unfortunately, Harmon had recently undergone surgery on her wrist for arthritis, but neither Officer Vail nor Bloxham knew of Harmon's preexisting condition nor did they observe a splint on her wrist. Officer Bloxham testified that Harmon was not wearing a splint that night (Dkt. 23-3, at 66-67) and that she would have avoided grabbing at Harmon had she seen any medical device on Harmon's wrist (Dkt. 23-3, at 77). Officer Vail testified that he was able to get a "full view" of Harmon's arm that night, that she was not wearing a splint, and that as an Arrest Control Tactics Instructor it wouldn't have been appropriate to grab someone's wrist while wearing a splint. Dkt. 23-3, at 113. However, Harmon claims the splint was on that night. Dkt. 23-3, at 182.

Even assuming arguendo that Harmon was wearing a splint on her wrist that evening, Officer Bloxham's actions in reaching out to grab Harmon's arm were "objectively reasonable under [the] circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th

Cir. 1994. Harmon was not violent or aggressive and Bloxham responded in kind. Her actions were not violent or overbearing, but tailored to the circumstances.

Further, even if some "minimal injuries" occurred as a result of the routine task of handcuffing—which didn't even occur in this case—such injury does not support an excessive force claim. *See, e.g., Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." (internal citation and quotation marks omitted)).

Here, upon the record, the Court finds that Officer Bloxham's actions were appropriate and "objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). The Court grants summary judgment on Harmon's excessive force claim.

3.    *Qualified Immunity*

In addition to the individual arguments discussed herein, Defendants also assert they are entitled to qualified immunity because they did not violate any clearly established right. The Court agrees.

As discussed *infra (see* Section A(1)(b)), the purpose of the doctrine of qualified immunity is to shield public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow*, 457 U.S. at 818. While the purpose of 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to harmed parties, *Wyatt v. Cole*, 504 U.S. 158, 161 (1992), to state a claim under § 1983, a plaintiff must allege facts which show a deprivation of a right, privilege,

or immunity secured by the Constitution or federal law by a person acting under color of state law. *Id.* Acting under color of state law is "a jurisdictional requisite for a § 1983 action." *West v. Atkins*, 487 U.S. 42, 46 (1988). In this case, it is undisputed that the Officers were acting under color of state law when they were performing their duties in this case. The question, therefore, is whether the Officers deprived Harmon of a right, privilege, or immunity secured by the Constitution or federal law.

To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232.

First, Defendants did not violate any constitutional right because they were authorized to arrest Harmon based upon a warrant supported by probable cause. In addition, even if the Court were to determine—now, after the fact—that the warrant was invalid, the Court's analysis would not change. "A police officer acting in good faith on an invalid arrest warrant is not liable for his actions." *Coulson*, 69 F.3d at 543 (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)).

Second, as previously noted in relation to Harmon's "show the warrant" argument, Harmon has not proven any other "clearly established right" that Defendants violated. She was not entitled to see the warrant or to have it explained to her; she was not maliciously prosecuted; Defendants did not use excessive force; and as will be explained shortly, Defendants did not need to intervene, nor was there a policy or custom affecting her rights. In short, Harmon cannot meet either prong of the qualified immunity test.

What's more, even were the Court to find some minor error or flaw in Defendants' behavior, such would likely still not be sufficient to defeat summary judgment on any particular claim. Qualified immunity is designed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft* 563 U.S. at 743. In this case, Defendants acted reasonably in all respects and the Court finds no clear violation of the law. Accordingly, the Court finds that Defendants are entitled to qualified immunity on the previously discussed claims. This is a second, independent reason supporting summary judgment.

4. *Practices or Policies "Monell" Claim (Claim 7)*

Next, Defendants contend that the City of Pocatello is not liable under any theory of *respondent superior* because Harmon cannot establish a genuine issue of fact based upon direct liability. The law is clear that governmental entities cannot be vicariously liable in § 1983 claims. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). Harmon's claims under § 1983 against the City of Pocatello are premised upon the alleged actions and/or conduct of Pocatello Police Department Officers. Here, Harmon is attempting to hold the City of Pocatello liable for the alleged actions and/or conduct of its employees, which is improper:

> In *Monell v. Department of Social Services of New York City*, 436 U.S. 658, 56 L.Ed.2d 611, 98 S. Ct. 2018 (1978), the Supreme Court held that a local governmental entity cannot be sued under § 1983 on a theory of respondeat superior. . . . Congress did not intend for counties to be held liable under a *respondeat superior* theory – a county will not be liable solely because it employs a tortfeasor.

*Limbert v. Twin Falls County*, 955 P.2d 1123, 1126 (1998) (citations omitted).

Under *Monell*, the only time a party can seek liability against a municipality is if he or she establishes that (1) he or she was deprived of a constitutional right; (2) the municipality (or entity) had a policy or custom; (3) the policy or custom amounted to deliberate indifference to his or her constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *See Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks omitted)).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled city policy." *Monell*, 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). A municipality's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks and citation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61.

The only allegation that could potentially meet the deliberate indifference standard in this case is Harmon's argument that the City had a policy or custom of having day

officers make affirmative misrepresentations and/or omit material facts in probable cause affidavits to obtain warrants. As the Court will explain below,[13] however, Harmon has not established the City had such a policy.

Furthermore, even if Harmon could show that *in this case* PPD mistakenly or recklessly obtained the affidavit and/or warrant, it would not be sufficient to support a *Monell* claim. The Supreme Court has held that a single incident of bad conduct does not create an issue of fact under *Monell*. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985). "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Id*. at 823.

Here, the Court has already found that Defendants did not violate any of Harmon's clearly established rights. There is therefore no basis within the prior claims to support a *Monell* claim. Turning more broadly to Harmon's allegations that the whole premise of her warrant and attempted arrest in this case is an indication of failures within the Pocatello Police Department, the Court finds it cannot accept this argument either. Besides Harmon's almost bare allegation regarding how PPD obtains warrants, she has not made any "link" between a custom or course of conduct of the City and the attempted arrest in this case. In sum, Harmon's *Monell* claim fails and summary judgment is appropriate.

### 5. Failure to Train / Failure to Intervene (Claims 5, 6)

Finally, similar to the preceding topic, Defendants argue that there is no link between any action taken by Defendants and any policy or custom illustrating that the City

---

[13] *See* Section IV(B)(1).

of Pocatello failed to train and/or supervise its Officers. For her part, Harmon re-alleges that the entire incident is evidence of the City's failure to adequately train its police officers.

Insofar as the court has determined that Officer Bloxham and Officer Vail acted appropriately under the circumstances, it cannot find that the City of Pocatello or the Pocatello Police Department failed to adequately train and/or supervise its employees (Claim 6). Summary judgment is appropriate on this claim.

In like manner, because Harmon's fifth claim is based on other officers' purported failure to intervene against Officer Bloxham when they "observed and had reason to know that excessive force was being used against Mrs. Harmon," and observed other "illegal actions" (such as not stating the cause of the arrest or showing the warrant)—claims which the Court has already found do not survive summary judgment—it similarly finds that summary judgment is appropriate on Harmon's failure to intervene claim.

### B. Plaintiff's Motion for Partial Summary Judgment (Dkt. 22)[14]

In her Motion for Partial Summary Judgment, Harmon focuses on three claims/issues. As eluded to numerous times, Harmon's first argument regarding the City and PPD's liability under *Monell* has morphed into one of the largest, most critical issues in this case. Because the Court has granted Harmon's Motion to Amend Complaint, this issue is now fully before the Court.

---

[14] While the Court has already discussed each of Harmon's claims, such was framed against the backdrop of Defendants' Motion for Summary Judgment. Harmon separately moved for Summary Judgment, but only as to three claims. As the Court noted at the outset, because these motions overlap, it is simply easiest to take them up in order. Thus, while there will be some limited repetition, it is organizationally more effective to address them as separate motions even though the subject matter intersects.

*1. Unlawful Policy for Probable Cause Affidavits (revised Claim 7)[15]*

In her Motion for Summary Judgment, Harmon begins by alleging that the City of Pocatello had an unconstitutional policy of having day officers make affirmative misrepresentations and/or omit material facts in probable cause affidavits to obtain warrants.

As already explained, a municipality is only liable under § 1983 where the municipality itself causes a constitutional violation. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987)). Here, Harmon alleges that the process used to obtain arrest warrants by Defendants is unconstitutional.

A misrepresentation in an affidavit constitutes a violation of the Fourth Amendment if the misrepresentation is material. *See Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). Misrepresentations can be affirmative or based on omission. Affirmative misrepresentations are material only if there is no probable cause absent consideration of the misrepresented facts. *Id*.

A misrepresentation based on an omission is material when the omitted facts "cast doubt on the existence of probable cause." *United States v. Garza*, 980 F.2d 546, 551 (9th

---

[15] In granting Harmon's Motion to Amend Complaint (Dkt. 29), the Court accepts Harmon's Amended Complaint (Dkt. 29-3) which expounds substantially upon the prior Claim 7, a general *Monell* claim. The Court has already rejected the original Claim 7. *See infra* Section IV(A)(4). In the Second Amended Complaint, Claim 7 is more geared towards how the PPD swears out affidavits. Accordingly, while somewhat confusing, the Court is essentially analyzing Claim 7 twice, as the *Monell* issues has been brought broadly (as originally plead) and then more specifically as to the affidavit process (as amended and expounded in Dkt. 29-3).

Cir. 1992) (internal quotation marks omitted). If a plaintiff can demonstrate that a warrant was issued as the result of a material misrepresentation, a police officer will not be granted qualified immunity if the plaintiff can also demonstrate that the police officer deliberately falsified information presented to the magistrate or recklessly disregarded the truth. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (quoting *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995)).

In this case, Harmon alleges that the City of Pocatello created an unconstitutional policy within its police department by having day officers make affirmative misrepresentations and/or material omissions in their Affidavits of Probable Cause on behalf of their fellow night officers. According to Harmon, the policy, custom, and/or practice implemented by PPD involved having the dayshift officers fill out a generic affidavit form with false statements, attach the night officer's report (which might include hearsay), personally appear before the judge, and then have the judge sign it. For example, Harmon argues that because day officers were "swearing" to facts in affidavits they had no personal knowledge of, they were affirmatively misrepresenting and misleading judges. Dkt. 22-1, at 5. In like manner, Harmon argues that because day officers did not actually speak to the night officers who wrote the underlying reports, they were passing along hearsay information, not corroborating investigations, and deceiving judges by saying the affidavits were true, accurate, and made "to the best of their knowledge." *Id.*

Caselaw is clear that officers need not have personal knowledge of the criminal investigation to execute an affidavit of probable cause—as long as they don't *claim* that they have personal knowledge of things they do not truly know. Said differently, officers

are permitted to rely on the facts learned from their fellow officers to prepare a truthful affidavit. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 110-11, (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983) (officers are allowed to "rel[y] on the facts learned from [] subordinates to prepare a truthful affidavit"); *United States v. Steed*, 465 F.2d 1310, 1315 (9th Cir. 1972) (other officers are a reliable source for determining information to include in an affidavit).

Given such authority and the facts of this case, the Court cannot find the City or PPD had an unlawful policy. Specifically, Officer Wright outlined the standard procedures for PPD and how those procedures allowed for reliance on other officers and information while still striving to ensure the most accurate information would be presented to the state Magistrate Judge. He then explained that he followed those procedures when he filled out the affidavit of probable cause and obtained the arrest warrant in this case.

Importantly, each time a PPD officer fills out a probable cause affidavit, the officer must state whether he or she knows the information personally or is relying upon other officer's reports and investigations. In this case, when obtaining the October 20, 2015, arrest warrant, Officer Wright attached the relevant police report from the night before and specifically noted that he "personally know[s] the author of that [attached] report to be a law enforcement officer whom I believe to be credible and reliable." Dkt. 24-1, at 7. Accordingly, it would have been abundantly clear to anyone looking at the affidavit that multiple officers were involved in the case. The fact that an officer "swears" or attests to

the truthfulness of the matters, "to the best of his or her knowledge," is appropriate—regardless of whether the officer obtained that information personally or from another officer.

The Eleventh Circuit has summarized this process well:

> Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number. To comply with the requirement of particularity and to enable the magistrate to make an independent probable cause evaluation, however, the agent must state in the affidavit that he is relying upon other officers. We caution that this requirement should not be viewed in a hypertechnical, rather than a common-sense, manner. It is sufficient if the affidavit recites at the outset, or if it is clear from reading the affidavit as a whole, that it is based in part upon information obtained from other law enforcement officers.

*United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) (internal quotations and citations omitted). The Court has reviewed Officer Wright's affidavit of probable cause and agrees that in all material respects, the actions were appropriate.

As this point, the Court must digress briefly to address Harmon's Motion to Strike (Dkt. 28). Harmon has moved to strike the aforementioned affidavit (Dkt. 24-1) of Shaun Wright filed in conjunction with Defendants' Response to [Harmon's]Motion for Partial Summary Judgment alleging that it is a sham affidavit because it contradicts Wright's prior deposition testimony. Defendants responded[16] to Harmon's Motion and outlined how each of Officer Wright's statements does not contradict his prior testimony but further clarifies and/or expounds upon what he previously said. The Court has reviewed Wright's affidavit, as well as his prior testimony, and finds that while there are nuances between the two, the

---

[16] Harmon never replied to Defendants' Response.

recent affidavit does not contradict Wright's prior testimony but instead develops it. For these reasons, the Court DENIES Harmon's Motion to Strike and will give Wright's affidavit the weight it deems appropriate.

Returning to Harmon's arguments, the Court finds that even were it to determine there was a false or misleading statement in the affidavit of probable cause, under *Franks,* the false statement must have been made either intentionally or with reckless disregard for the truth *and* been necessary to the finding of probable cause in order for it to render the warrant invalid. *Franks,* 438 U.S. at 155-56; *See also Crowe v. Cty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) ("Even if a plaintiff is able to demonstrate that a warrant was issued as the result of a material misrepresentation, a police officer defendant may still be entitled to summary judgment on qualified immunity grounds, unless the plaintiff can also demonstrate that the police officer deliberately falsified information presented to the magistrate or recklessly disregarded the truth.") (citing *Hervey v. Estes,* 65 F.3d 784, 789 (9th Cir.1995)).

Here, Harmon alleges that had Officer Wright investigated the claims himself when filing out the affidavit, and that, if he had looked at the text messages in question, he would have realized that there was no telephone harassment and consequently that there was no basis for the warrant. Harmon claims that this lackadaisical behavior is indicative of "reckless disregard for the truth." Dkt. 22-1, at 11. As noted, however, Officers are allowed to rely on facts obtained from other officers and are not *required* to conduct an independent investigation. Second, it is not entirely clear that the outcome Harmon suggests—that an investigation would have shown that the text messages from Harmon were not directed at

the individual claiming harassment, and/or were not harassing in nature—would have been the automatic result. This is pure speculation and because Harmon cannot point to any objective or reckless behavior on Wright's part, the Court finds it difficult to accept that a constitutional violation has occurred. Critically, "omissions or misstatements in a search warrant affidavit, although negligent, are fatal only if reckless and made with intent to deceive the court. Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978) (citing *Franks,* 438 U.S at 171).

Here, while it does appear (in hindsight) that the affidavit contained information that likely wouldn't lead to an arrestable offense, based upon the evidence in the Wright's possession at the time—and finding no deliberate indifference, objective misrepresentation, or reckless action on his part—the Court is not persuaded by Harmon's argument. Accordingly, Wright is afforded qualified immunity in this instance because there is no evidence of a deliberate falsification or reckless disregard for the truth.

Broadening this concept beyond the confines of the instant case, Harmon has also not provided sufficient evidence to support the allegation that Defendants City of Pocatello or PPD engaged (then or now) in any unconstitutional policy or custom under *Monell.* Harmon's Motion for Summary Judgment on this claim is, therefore, DENIED.

*2. Unlawful Arrest*

Next, Harmon alleges there is no dispute of fact that Harmon was unlawfully arrested. Dovetailing into the above discussion, Harmon first alleges that her Fourth Amendment rights were violated because a warrant was issued without probable cause.

First, as the Court just found, a lawfully obtained warrant was issued for Harmon and Defendants were within their rights to act upon it. Second, as was discussed in the prior section, Harmon was never under arrest because Officers Bloxham and Vail never had physical control over her, nor had she acquiesced to their authority. Consequently, Harmon's request for summary judgment on this claim must be DENIED.

3. *Malicious Prosecution*

Correspondingly, relying on the idea that no probable cause existed in the first instance, Harmon asserts that malice can be inferred in this case and that all Defendants action—from the initial "false" affidavit all the way to the dismissal of the charges—are evidence they "prosecuted" her in an unreasonable manner.

Because the Court finds that Defendants *had* probable cause and a valid warrant and that Harmon was never actually prosecuted, this claim fails. The individual actions taken by officers throughout the process were valid, justified, and legal. Each is also entitled to qualified immunity. The Court thus DENIES Harmon's motion for summary judgment on this claim.

## V. CONCLUSION

After an exhaustive review of the facts of this case, the deposition testimony, the parties' briefs, and all relevant caselaw, the Court finds that Harmon's individual circumstances do not give rise to any colorable Fourth Amendment cause of action. Furthermore, there is no evidence to support the broader allegations that Defendants engaged in a widescale unconstitutional policy or practice. Summary Judgment is, therefore, properly granted in favor of Defendants on each of Harmon's claims.

## VI. ORDER

IT IS HEREBY ORDERED:

1.  Harmon's Motion to Amend/Correct (Dkt. 29) is GRANTED.

2.  Harmon's Motion to Strike (Dkt. 28) is DENIED.

3.  Harmon's Motion for Partial Summary Judgment (Dkt. 22) is DENIED.

4.  Defendants' Motion for Summary Judgment (Dkt. 21) is GRANTED.

5.  The Court will enter a separate judgment in accordance with Federal Rule of
    Civil Procedure 58.

DATED: January 7, 2020

David C. Nye
Chief U.S. District Court Judge